# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 16-1670V**
**Filed: February 1, 2019**
PUBLISHED

|  |  |
|---|---|
| JENNIFER REED,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>                    Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Tetanus Diphtheria<br>acellular Pertussis (Tdap) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Darryl R. Wishard, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On December 20, 2016, Jennifer Reed ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a Tetanus Diphtheria acellular Pertussis ("Tdap") she received on March 28, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

On February 2, 2018, the undersigned issued a ruling finding petitioner entitled to compensation.  (ECF No. 27). A damages order was issued the same day.  (ECF No. 28).  The parties were unable to reach an agreement on the appropriate amount to award Ms. Reed for her pain and suffering.  This case is now ripe for adjudication on damages.

## I.    Procedural History

Ms. Reed filed her petition for compensation on December 20, 2016.  (ECF No. 1).  Two days later, she filed five medical record exhibits in support of her petition. (ECF No. 6).  On February 4, 2017, Ms. Reed filed several additional updated medical records exhibits.  (ECF No. 9).  On May 12, 2017, respondent filed a status report stating that a review of the case was complete and respondent agreed to pursue a litigative risk settlement.  (ECF No. 18).

On May 16, 2017, the parties contacted the staff attorney managing this case to inform the court that they had reached a tentative agreement in this case.  The undersigned issued a 15-week order setting a deadline for respondent to file a status report confirming that a joint stipulation had been sent to petitioner for her signature. (ECF No. 19).  However, on June 12, 2017, respondent filed a status report stating that the authorized representative of the Attorney General had declined to grant settlement approval for the proposed tentative settlement in this case.  Respondent requested a status conference to discuss further proceedings and to set a deadline for filing his report pursuant to Vaccine Rule 4(c).  (ECF No. 20).

On June 28, 2017, respondent filed his report pursuant to Vaccine Rule 4(c) stating that this case was not appropriate for compensation under the terms of the Vaccine Act.  Respondent's Report at 1.  Respondent argued that petitioner had not alleged a SIRVA claim, claiming that petitioner's medical history demonstrated that the onset of her symptoms was greater than 48 hours and thus, did not qualify as a Table SIRVA injury.  *Id*. at 6.  In addition, respondent argued that petitioner's evidence also failed to meet her burden for a causation-in-fact claim because she had not provided a medical theory that causally connected her vaccination to an alleged vaccine-related injury.  *Id*.  Respondent also argued that petitioner had not provided a logical sequence of cause and effect implicating a vaccination, nor did petitioner provide an expert report in support of her claim.  *Id*. at 7.

On June 29, 2017, the undersigned issued an order withdrawing the previously issued 15-week order.  (ECF No. 23).  Petitioner was ordered to file an affidavit describing the facts and circumstances surrounding the onset of her SIRVA in addition to any other evidence petitioner wished to have considered regarding her vaccine-related injury or any issues raised in Respondent's Rule 4(c) report.  (ECF No. 24)

On August 15 and 16, 2017, petitioner filed her own affidavit, several witness affidavits, and her payroll records. (ECF No. 27-28).  On September 5, 2017, respondent was ordered to file a status report indicating how he intended to proceed in light of the additional information filed by petitioner.  (ECF No. 30).

On September 7, 2017, respondent filed a status report stating that the case could not be settled.  The parties reported that the record was complete and requested a ruling on entitlement.  (ECF No. 31).

On September 14, 2017, petitioner filed updated medical records. (ECF No. 33). Respondent filed a status report on October 6, 2017, indicating that he would rely on his June 28, 2017 Rule 4(c) report in lieu of providing a motion for ruling. (ECF No. 34). Ms. Reed filed her motion for ruling on the record on October 10, 2017. (ECF No. 25). She also requested additional updated medical records on January 29, 2018.

On February 2, 2018, the undersigned issued a ruling finding petitioner entitled to compensation. (ECF No. 27). A damages order was issued the same day. (ECF No. 28).

On March 16, 2018, petitioner filed a status report stating that the parties were unable to informally resolve the damages in this case. Petitioner requested that the undersigned schedule a hearing to resolve damages, arguing that she was continuing to experience pain and suffering as a result of the vaccination and that she was anxious to have the case resolved. Petitioner stated that she had a modest claim for lost wages and past unreimbursed expenses, but the primary issue for resolution was the appropriate amount for her pain and suffering. (ECF No. 39). Petitioner continued to file updated medical records. (ECF No. 40, 47, 48, 52).

The parties filed their pre-hearing submissions on August 1, 2018. (ECF Nos. 50-51). A damages hearing was held on August 23, 2018, in Boston, Massachusetts. (*See* Transcript of Proceedings ("Tr.") at ECF No. 56). Petitioner, Jennifer Reed, her daughter, Kiara Reed, and her former co-worker, Jolynn Lachance, all testified. *Id*.

Following the hearing, petitioner filed additional documentation of her medical expenses as well as additional medical records. (ECF Nos. 57, 60). On November 2, 2018, the parties filed a joint status report confirming respondent's proffer of $4,931.06 for petitioner's past unreimbursable expenses in this case. (ECF No. 63). This matter is now ripe for adjudication on the issue of damages.

## II.    Factual History

On March 28, 2016, Ms. Reed (age 43) received a Tdap vaccine in her right shoulder (her dominant arm) during an annual routine gynecological appointment at Dartmouth-Hitchcock Medical Center located in Lebanon, New Hampshire. Petitioner's Exhibit ("Pet. Ex.") 1 at 1; Pet. Ex. 2 at 1; Tr. 23. Her medical history is significant for lower back pain, a herniated disc, anemia, gastroesophageal reflux, dysmenorrhea and a hysterectomy. *Id*.; Pet. Ex. 3 at 1-3. Ms. Reed's medical history does not mention any history of a right shoulder injury and does not otherwise appear to be contributory to her claim in this case. Tr. 19.

Ms. Reed testified that she experienced pain as soon as the Tdap vaccine entered her shoulder. Pet. Ex. 8 at 1; Tr. 22. She averred that "[t]he pain I experienced was immediate and severe. In fact, when I expressed to the nurse how badly the shot hurt at the time she administered it, she told me that pain with the Tdap shot was normal. I figured the pain would go away on its own." *Id*. at 1, ¶3; Tr. 22. When she arrived home, Ms. Reed stated that she iced her arm as she had been instructed to do by the nurse. Tr. 24.

By the next day, March 29, 2016, Ms. Reed described the pain as "unbearable." She stated that although she went to work, she was unable to perform her work duties

because of the pain and she left work shortly after arriving.  Tr. 24; Pet. Ex. 10 at 1.  Ms. Reed also stayed home from work the next day, Wednesday, March 30, 2016, due to the pain.  *Id*.; Pet. Ex. 8 at 1, ¶4.  By the following week, the pain had worsened to the point that she could barely lift her right arm.  *Id*. at 2, ¶5; Tr. 26.

On April 8, 2016, 11 days after vaccination, Ms. Reed called her gynecologist's office complaining that her right arm was still painful where the Tdap vaccine was administered.  Pet. Ex. 2 at 7; Tr. 25.  She explained to the nurse that over the past three days, her arm had become painful to lift.  *Id*.  She described the pain as "feeling like the muscle is torn."  *Id*.; Pet. Ex. 8 at 2, ¶5 (Reed Affidavit).  During her hearing testimony, Ms. Reed described her pain as a:

> searing, intense pain, and I couldn't even shift my shoulder away from my body. Like it was literally stuck here in this position, and each time I did try to move it it was like intense to the point where I just balled because it hurt so bad. I'm like, what's going on on?'

Tr. 27.  Ms. Reed told the nurse that she had been taking ibuprofen, icing, and applying warm compresses to the injection site to treat her pain to no avail.  Pet. Ex. 8 at 2, ¶5 (Reed Affidavit).  She was advised by the nurse to contact her primary care physician for an evaluation.  Ms. Reed explained that she had already contacted her primary care physician but was unable to obtain an appointment for several weeks.  The nurse consulted one of the physicians in the practice, Dr. Feltmate, who prescribed Lidoderm patches to Ms. Reed in the meantime.  *Id*.; Tr. 25.  By April 12, 2016, Ms. Reed stated that the Lidoderm patches were not helping, but she was scheduled to see her primary care physician the next day.  *Id*.

On April 13, 2016, Ms. Reed presented to her primary care physician, Dr. Angela Karavasilis, for a previously scheduled follow-up appointment for Ms. Reed's blood pressure.  Pet Ex. 3 at 42.  During this appointment, Ms. Reed reported to Dr. Karavasilis that her right arm had been hurting "ever since" she received the Tdap vaccine on March 28, 2016.  *Id*.  She reported that she "started to notice intense pain involving her right upper arm that she describe[d] as a constant dull ache that becomes worse with certain movements."  Ms. Reed also described the pain as throbbing and burning and rated the pain as a 7 out of 10.  Pet. Ex. 3 at 42-43.  Ms. Reed noticed a decrease in her range of motion of her right shoulder.  *Id*.  Upon physical examination, Ms. Reed exhibited tenderness to palpation over her right upper bicep tendon and in the general area of her right humerus.  *Id*. at 44.  She had "significant weakness" to isometric resistance as compared to her left arm.  *Id*.  An x-ray examination was ordered and Ms. Reed was given a referral for an orthopedic consultation.  *Id*.  The results of her shoulder x-ray were normal.  Pet. Ex. 3 at 133-36; Pet. Ex. 4 at 13-14.

On April 15, 2016, Ms. Reed presented to orthopedist, Dr. Albert Tom, for an initial evaluation.  Pet. Ex. 3 at 142.  Dr. Tom noted that Ms. Reed had a "well-functioning arm and shoulder until she received a tetanus shot" and "developed soreness at the injection site" and is unable to "move her arm complaining of intense pain."[3]  *Id*.  Dr. Tom noted that Ms. Reed rated her shoulder pain as an 8 out of 10.  *Id*.  Upon examination, Ms. Reed was guarding her right arm stating that she was unable to move it.  She complained of pain in the lateral shoulder at the deltoid and the anterior

---

[3] Dr. Tom recorded an incorrect date of the Tdap vaccination as April 1, 2016, throughout his records.

biceps region. *Id.* at 143-44. Dr. Tom noted pain with abduction to 45º and forward flexion to 45º. He prescribed Mobic and Tylenol and recommended that Ms. Reed ice and avoid painful activities involving her right shoulder. *Id.* at 144. He also ordered an MRI study and instructed Ms. Reed to follow up with him after the MRI was complete. *Id.*

On April 26, 2016, Ms. Reed underwent an MRI of her right upper arm. Pet. Ex. 3 at 115-16. The results showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head. *Id.* at 116. The bicep muscle and tendon appeared normal. *Id.*

On May 11, 2016, Ms. Reed underwent a physical therapy evaluation at St. Joseph Hospital Rehabilitation Services. Pet. Ex. 3 at 137. Ms. Reed recounted that her shoulder pain began a few days after receiving a Tdap injection on March 28, 2016. Pet. Ex. 5 at 152. She stated that by the end of that first week, she could not move her arm. *Id.* She reported significant pain with her work duties as a retail manager. *Id.* Ms. Reed reported her current level of pain at a 6 out of 10, with her best level at a 5 and her worst level at a 9. Pet. Ex. 3 at 137. In the assessment, the physical therapist noted right rotator cuff involvement and decreased right shoulder active range of motion ("AROM"), decreased right shoulder strength, decreased scapular strength, and impaired posture and increased pain. *Id.* Ms. Reed's functional deficits included raising her right arm, reaching behind her back to unhook her bra, dressing, sleeping, pulling, pushing, lifting, and carrying and with her work duties. *Id.* She had positive results on certain rotator cuff impingement tests, including the Empty Can Test, Full Can Test and Speed's Test, although other impingement tests were negative (Neer Impingement, Hawkins-Kennedy and Lift-off test). Pet. Ex. 5 at 155. Ms. Reed was assessed on the shoulder pain and disability index (SPADI) with a shoulder disability of 50%. Pet. Ex. 5 at 157. It was recommended that Ms. Reed begin a skilled physical therapy program. Ms. Reed stated that she was only able to attend physical therapy one to two times a week due to her work schedule. Pet. Ex. 3 at 137.

Ms. Reed attended physical therapy sessions on May 18, 25, June 2, 8, 15, and 22. Pet. Ex. 5 at 136-47. Her pain levels and symptoms remained the same during this time.

On June 26, 2016, Ms. Reed underwent a right shoulder arthrogram. Pet. Ex. 4 at 7. No abnormalities or evidence of a rotator cuff tear were seen although there was evidence of edema in the infraspinatus muscle. Pet. Ex. 4 at 9.

On June 30, 2016, Ms. Reed returned to Dr. Tom with complaints of continued right shoulder lateral pain and to review the results from her recent MRI and arthrogram. Pet. Ex. 7 at 1. Dr. Tom noted that Ms. Reed's shoulder pain was localized over the proximal deltoid region. On examination, Ms. Reed had improved active range of motion with forward flexion and abduction, but restricted movement with external and internal rotation. *Id.* at 3. Dr. Tom noted that the June 27, 2016 MRI arthrogram showed "slight residual edema in the infraspinatus muscle," which was improved from the April 26, 2016 MRI. He noted no evidence of a rotator cuff tear and evidence of a cyst in the posterior humeral head that was seen on a previous MRI. *Id.* Dr. Tom's assessment was rotator cuff syndrome and he administered a cortisone injection to Ms. Reed's right shoulder during this appointment. *Id.* He noted that Ms. Reed had improvement of her shoulder symptoms with physical therapy and anti-inflammatory

medications.  Dr. Tom reassured Ms. Reed that there were no structural tears and he "expect[ed] the edema in the muscle of the infraspinatus to continue to improve as it has been."  *Id*. at 3.  Ms. Reed was instructed to follow-up in six weeks.  *Id*.

On July 6, 2016, Ms. Reed presented for her physical therapy appointment and reported that she had received a cortisone injection in her shoulder one week prior. Pet. Ex. 3 at 139; Pet. Ex. 5 at 111.  She stated that the injection helped for several days, but that the pain had started to return.  *Id*.  She rated her pain as a 2 out of 10 during this session.  *Id*.  In the assessment, it is noted that Ms. Reed had made significant improvement with her range of motion of the right shoulder, although she continued to have limited AROM with her internal and external rotation due to pain.  Ms. Reed also made improvements with her right shoulder strength and function.  Continued physical therapy was recommended.  *Id*.

On July 22, 2016, Ms. Reed was seen by her primary care physician for complaints of acid reflux and headaches.  Pet. Ex. 3 at 6.  There were no shoulder complaints noted during this visit.

Ms. Reed attended physical therapy on July 6, 20, and 27.  Pet. Ex. 5 at 114-22. She reported that the relief from her cortisone injection was wearing off.  She stated that she began having pain whenever she tried to lift anything more than 2-3 pounds.  *Id*. at 120.

On August 3, 2016, during her physical therapy session, Ms. Reed reported that her pain had been slowly returning since receiving the steroid injection.  She felt that the pain levels had returned almost to the level it was prior to the steroid injection.  Pet. Ex. 5 at 60.  Later on the evening of August 3, 2016, Ms. Reed was seen in follow-up after an emergency room visit on July 25, 2016, where she had a near-syncope episode and elevated blood pressure.  Pet. Ex. 3 at 31.  Ms. Reed reported that she had not been taking her blood pressure medication because she had been trying to lower her blood pressure through diet and exercise.  *Id*.  She was advised to resume taking her blood pressure medication.  *Id*.

On August 9, 2016, Ms. Reed had a follow-up appointment with Dr. Tom.  Pet. Ex. 3 at 146.  She reported that she only had about a week and half of pain relief after she received her cortisone injection on June 30, 2016.  *Id*.  She also noted that her job duties in retail were exacerbating her symptoms.  Ms. Reed continued to complain of pain (at a level of 5/10) over the anterior lateral region of her right arm.  She also noted a mild clicking sensation in the area.  Ms. Reed reported that she was unable to tolerate the Mobic that was prescribed due to the side effects and she had instead been taking over-the-counter anti-inflammatory medication.  *Id*.  Upon physical examination, Dr. Tom noted localized pain in the anterior lateral arm region and shoulder.  Ms. Reed's active range of motion of the right shoulder was improved to 160º for active forward flexion, 160º with abduction, and 160º with external rotation.  *Id*. at 148.  Ms. Reed's internal rotation was still at 40º, but her motor strength had increased to a 5/5 without weakness.  She still had pain with resisted supraspinatus testing and mild discomfort with the impingement test.  *Id*.  Dr. Tom noted that he and did not see any repairable structural abnormality on her MRI although he did see findings of edema.  He recommended that Ms. Reed continue attending physical therapy, taking over-the-counter anti-inflammatory medication and avoiding any aggravating activities.  *Id*. at 148.  Dr. Tom also discussed with Ms. Reed that he did not see any findings that could

be improved with surgical intervention.  *Id.*  He instructed her to follow up in two months for a re-evaluation.  *Id*.

Ms. Reed attended physical therapy on August 10, 17, and 24.  Pet. Ex. 5 at 63-72.  During this time, her pain levels continued to increase and she reported feeling discouraged by her progress.

On August 17, 2016, Ms. Reed had another follow up appointment with her primary care physician for her blood pressure.  Pet. Ex. 3 at 69.  During this visit, Ms. Reed requested a referral to another orthopedist to evaluate her chronic right shoulder pain.  She reported that her current orthopedist, Dr. Tom, had diagnosed her with bursitis and tendinitis of the right shoulder.  She stated that Dr. Tom had given her a cortisone injection and that she had completed physical therapy which improved her range of motion of the right shoulder, but she was continuing to have pain.  *Id*.  She was given a referral to another orthopedist.  *Id*. at 72.

On August 24, 2016, Ms. Reed presented to orthopedist, Dr. Anthony Marino, for an initial evaluation.  Pet. Ex. 4 at 25.  Ms. Reed reported that she began having difficulty with her right shoulder several days after her tetanus vaccine.  She explained that she saw Dr. Tom who attempted to conservatively treat her symptoms with physical therapy, a steroid injection and with time, but she was continuing to experience pain.  *Id*.  On examination, Dr. Marino noted that Ms. Reed had good range of motion of the right shoulder, but definite pain to "resistive function".  He did not see frozen shoulder syndrome and noted that her MRI showed "a little irregularity and thickening in the rotator cuff and bursa."  *Id*.  Dr. Marino's diagnosis was tendonitis of the right shoulder with pain after vaccination.  He explained that the conservative treatment she had previously undergone with Dr. Tom is what he generally would have recommended.  Dr. Marino proposed prescribing a Medrol Dose Pak to decrease the inflammation.  He stated that surgical intervention was a possibility later in time, but that he would not recommend surgery at this time.  *Id*.  A physical therapy note from the same date documented that Ms. Reed had a shoulder disability index of 49%.  Pet. Ex. 5 at 57.

On September 14, 2016, Ms. Reed returned to Dr. Marino for a follow up of her right shoulder symptoms.  Pet. Ex. 4 at 2, 24.  Ms. Reed reported that she took the Medrol Dose Pak without relief.  Pet. Ex. 4 at 2.  She still complained of shoulder stiffness in the morning.  *Id*.  Dr. Marino revisited the possibility of shoulder surgery with Ms. Reed, stating that there was a possibility that an acromioplasty[4] could be of benefit.  He explained that with an acromioplasty, he would inspect the shoulder tendon and remove any scarred bursa.  Dr. Marino advised that the surgery may not completely relieve her symptoms, but hopefully would provide some short and/or long-term relief.  *Id*.  Ms. Reed elected to proceed with surgery.  Pet. Ex. 6 at 3.

Ms. Reed underwent her annual physical exam with her primary care physician on September 21, 2016.  Pet. Ex. 3 at 15.  In the musculoskeletal portion of the physical exam, it is noted that Ms. Reed had "full range of motion of all joints with no swelling or deformity," although it is also documented in her medical history that she sees an orthopedic for chronic right shoulder pain.  *Id*. at 15, 18.

---

[4] Acromioplasty is defined as a "surgical removal of an anterior spur of the acromion to relieve mechanical compression of the rotator cuff during movement of the glenohumeral joint."  Dorland's at 20.

Ms. Reed was seen by Dr. Marino again on September 21, 2016, where she was scheduled for shoulder surgery.  Pet. Ex. 4 at 2.  She was fitted for a sling and given pre-operative instructions for surgery.  *Id*.

On September 27, 2016, Ms. Reed underwent a right shoulder arthroscopic debridement and right shoulder arthroscopic acromioplasty performed by Dr. Marino. Pet. Ex. 4 at 4.  During the procedure, he noted that the undersurface of the rotator cuff, biceps tendon and labrum and articular cartilage were all normal.  However, there was significant swelling all along the bursa with "some thick bursal tissue with several bands."  *Id*.  The area along the bursa and inside the bursa were debrided and an anterior inferior acromioplasty were all performed with a power shaver.  *Id*.  The surgery was completed without complication.  *Id*. at 4-5.

Ms. Reed had her first post-operative appointment with Dr. Marino on October 5, 2016, and her sutures were removed.  Pet. Ex. 4 at 2.  She complained that she was still experiencing a lot of soreness.  *Id*.  She was prescribed a refill of Percocet for continued pain.[5]  *Id*.

Ms. Reed underwent an initial evaluation at Apply Therapy Services on October 12, 2016.  Pet. Ex. 31 at 2.  During this evaluation, Ms. Reed stated that she was taking Percocet 1-2 times a day and icing her shoulder when necessary.  *Id*.  She rated the severity of her pain as a 0/10 at best and 9/10 at its worst.  Her pain level at this appointment was rated as a 3/10.  *Id*.  In the assessment, it is noted that Ms. Reed tolerated her physical therapy session well, with "minimal complaints of pain at end range shoulder flexion, abduction and resisted internal rotation."  *Id*.  It was recommended that Ms. Reed attend physical therapy for three visits a week with an expected duration of six weeks.  *Id*. at 4.

Ms. Reed attended 18 physical therapy visits from October 21, 2016 to February 22, 2017, at which time she was discharged to a home exercise program.  Pet. Ex. 31. Over the course of her physical therapy treatment, Ms. Reed rated her pain on average at a 3 out of 10, with the severest pain level at a 5 out of 10.  *Id*. at 53.  Her status on discharge was "improved."  *Id*. at 64.  Ms. Reed achieved two of the three goals listed for physical therapy including "decrease pain to 5/10 at worst" and "range of motion improvements to shoulder – flexion, abduction."  *Id*.  She was listed as 30% improved in the remaining goal of "ADL Improvements in activities… reaching, lifting."  *Id*.

On November 2, 2016, Ms. Reed had her second post-operative appointment with Dr. Marino.  Pet. Ex. 4 at 27.  She reported that she was doing "okay" but had a setback and felt that something "popped" in her shoulder.  *Id*.  On physical examination, Ms. Reed had good range of motion although she had some subacromial irritation.  *Id*. at 28.  Dr. Marino diagnosed Ms. Reed with right shoulder tendonitis and subacromial irritations.  Pet. Ex. 4 at 28.  He recommended that Ms. Reed continue with her physical therapy noting that her current condition was not out of the ordinary.  She was instructed to follow-up in six weeks, if necessary.  *Id*.

---

[5] Ms. Reed testified she was first prescribed Tramadol by her primary care physician in October 2016; however, this record has not been located.  Tr. at 54.  The prescription records from Rite Aid Pharmacy filed as petitioner's exhibit 24 confirms that Dr. Karavasilis first prescribed Tramadol to Ms. Reed on November 29, 2016.  Pet. Ex. 24 at 2.

On January 25, 2017, Ms. Reed presented to Dr. Marino for a follow up appointment.  Pet. Ex. 29 at 1.  She reported very slow progress and "maybe some improvement in the pain."  *Id.*  Ms. Reed described the pain as different from her pre-operative pain, but explained that she still had definite limitations in her daily activities and pain disruption.  *Id.*  On examination, Ms. Reed demonstrated "slight limitation of external rotation with good function[] and motion, some pain to resistive function. Wounds are fine."  *Id.*  She was assessed with tendonitis of the right shoulder.  In the Plan section of the notes from this visit, Dr. Marino states that "the decision at this point is whether we have to intervene to do anything."  He noted that the follow-up MRI showed bursitis, as expected.  Ms. Reed was hesitant to obtain another steroid injection because her injury was caused by an injection.  *Id*.  She was instructed to follow up in six weeks.  *Id.*

On January 31, 2017, Ms. Reed was referred by her PCP to a pain management physician, Dr. Yulan Wang, for an initial evaluation.  Pet. Ex. 12 at 1.  Ms. Reed recounted her history of shoulder pain and shoulder symptoms that began after she received a Tdap shot in March 2016.  She stated that the treatments that she had tried, which included physical therapy, had not provided pain relief.  Ms. Reed described the pain as aching, constant and made worse by reaching and better with rest.  *Id.*  Ms. Reed stated that she was taking Tramadol[6] twice a day over the past three months as that was the only medication that was helping her pain.  *Id.*  On physical examination, Dr. Wang noted a limited range of motion of the right shoulder (the left shoulder range of motion was within normal limits).  He reviewed the most recent MRI study, dated November 29, 2016, which showed "considerable fluid" in the subacromial/subdeltoid bursa consistent with bursitis.  He also noted that while there was no good evidence for a rotator cuff tear, there was a slight "T2 hyperintensity in the supraspinatus muscle probably related to myositis/tendinitis."  *Id*. at 3.  Dr. Wang further noted that Ms. Reed had "right shoulder pain for over 10 months post vaccine injection," that she had arthroscopic surgery, and had "failed NSAID, muscle relaxers, Lidoderm patches and cortisone injections."  Pet. Ex. 12 at 4.  He opined that it was reasonable for Ms. Reed to take Tramadol in order for her to work.  *Id*.  Dr. Wang initiated an "opioid agreement and urine drug testing" based on protocol.  *Id*.  He gave Ms. Reed one prescription for Tramadol and asked her to return in four weeks.  *Id*.

Ms. Reed returned to Dr. Wang in follow-up on March 1, 2017.  Pet. Ex. 12 at 5. She reported no change in her pain level and rated it at a 5 out of 10.  In the assessment, Dr. Wang noted that Ms. Reed's symptoms were stable with Tramadol twice daily as needed.  He recommended that she follow-up in another four weeks.  *Id*. at 7.

Also, on March 1, 2017, Ms. Reed returned to Dr. Marino for her six week follow up appointment.  Pet. Ex. 29 at 2.   Ms. Reed reported that she had completed her most recent round of physical therapy and she thought that the PT helped "a bit."  In the section of "current medications" it is noted that Ms. Reed is taking 50mg of Tramadol

---

[6] The notes state: "She takes Tramadol twice daily that is the only medication has been helping. She has been on the medication for three months. She is referred by her primary care provider to take over Tramadol. She has no pain contract."  Pet. Ex. 12 at 1.  Ms. Reed testified that she was first prescribed Tramadol by her primary care physician in October 2016.  Tr. at 54-55.  However, the record of this visit and the documentation of the first prescription of Tramadol is not contained within the records.  *See also* Post-Hearing Scheduling Order dated August 28, 2018.  (ECF No. 54).

with a prior Rx reference number.  On examination, Dr. Marino noted that Ms. Reed had good range of motion of her shoulder, but slight pain to "resistive function".  He further noted that she did not have frozen shoulder.  Dr. Marino documented that Ms. Reed was going to continue to work on her exercises on her own; he did not think that formal therapy was indicated or necessary.  He noted "[w]e will see how she does long-term in terms of legal involvement. Push her exercises as able. She will follow-up here in several months to monitor her progress."  *Id.*

By March 29, 2017, Ms. Reed reported to Dr. Wang that the Tramadol was helping her pain.  Pet. Ex. 12 at 8.  On examination, Dr. Wang noted a slight decrease in the range of motion of Ms. Reed's right shoulder.  *Id*. at 9.  She recommended that Ms. Reed continue with her current medication treatment and return in two months for a follow-up examination.  *Id*. at 10.

Ms. Reed's next appointment with Dr. Wang took place on May 30, 2017, where she rated her pain level at a 6 out of 10.  Pet. Ex. 12 at 12.  Ms. Reed stated that she had no change in her pain level but that the Tramadol was keeping her symptoms stable.  She stated that her activities of daily living were still limited with the pain.  She was unable to reach or lift.  *Id*.  Ms. Reed was encouraged to continue with her current pain management plan and to follow up in three months.  *Id*. at 14.

On June 7, 2017, Ms. Reed followed up with Dr. Marino.  Pet. Ex. 13 at 1.  On examination, Dr. Marino noted that his clinical exam showed a healthy appearing patient, "tells a reliable story, not a frozen shoulder."  He noted that Ms. Reed was able to put her arm up over her head and she had completely healed wounds from her surgery.  Dr. Marino also noted some pain with "resistive function" of the shoulder, but an intact bicep tendon.  In his assessment, Dr. Marino stated that he did "not really have a quick fix."  They discussed the possibility of attempting another cortisone shot, but Ms. Reed declined.  *Id*. at 2.  Dr. Marino stated that "hopefully long-term these types of problems are self-limiting and will see hopefully continued improvement long term. I do not think there is any need for further intervention or surgical intervention at this time. She understands this and will come back here if needed."  *Id*. at 2.

Ms. Reed returned to Dr. Wang on September 7, 2017 with essentially the same presentation as her prior May 30, 2017 appointment.  Dr. Wang again recommended that Ms. Reed continue on her current treatment plan.  *Id*. at 15-17.

At her October 4, 2017 appointment with Dr. Wang, Ms. Reed reported her pain level at a level five out of 10.  She stated that there had been no change in her activity level since her last visit.  She did, however, report that her Tramadol had been stolen.  Pet. Ex. 14 at 1.  Dr. Wang noted that Ms. Reed filed a police report when five of her Tramadol tablets had been stolen while she was at work.  Ms. Reed received a warning that she would be discharged if she lost her medication again.  *Id*. at 2-3.

Ms. Reed presented to Dr. Wang on November 1, 2017 for trigger point injections to treat her neck and shoulder pain.  Pet. Ex. 14 at 5.  She complained of pain on the right side of her neck.  Ms. Reed was instructed to follow up in four weeks.  *Id*. at 7. However, at her next appointment on December 5, 2017, Ms. Reed reported that the trigger point injections provided no relief.  *Id*. at 11.

On January 23, 2018, Ms. Reed presented to certified nurse practitioner, Tonya Watkins.[7]  Pet. Ex. 14 at 12.  Ms. Reed stated that she continued to work her retail job despite the pain and that some days were harder than others due to the increased workload.  Ms. Reed reported that she took Tramadol twice daily, although she sometimes took an extra ½ tablet with worsening pain and then another day she would take ½ dose less.  After a physical examination, Nurse Watkins noted an assessment of bursitis of the right shoulder and prescribed Tramadol with five extra tablets to take as needed.  Ms. Reed stated that she would look into craniosacral massage as Nurse Watkins stated that her trapezius muscle would greatly benefit from the massage.  *Id*. at 14.  Ms. Reed was instructed to follow up in four weeks.  *Id*. at 15.

Ms. Reed continued to see Nurse Watkins on February 27, 2018, March 27, 2018, and May 24, 2018, with essentially the same symptoms.  She was advised to continue on her current treatment plan.  Pet. Ex. 15; Pet Ex. 16.  During her May 24, 2018 appointment, Ms. Reed stated that she had recently started a new job at Walmart that required that she wake up earlier than normal and as a result, her sleep quality had been poor.  Pet. Ex. 16 at 1. She stated that her new job would involve much less physical labor.  *Id*.

During her July 5, 2018 appointment with Nurse Watkins, Ms. Reed reported that her symptoms were worsening.  Pet. Ex. 20 at 1.  She stated that she was doing more physical work at Walmart than anticipated, and in addition to focal shoulder pain, she now felt pain radiating from her right scapula down into her right triceps, and occasionally into her wrist and fingers.  *Id*.  Nurse Watkins suspected a certain degree of cervical radiculopathy and ordered a cervical MRI for further evaluation.  *Id*. at 3.

Ms. Reed underwent the MRI on July 18, 2018, which demonstrated a small syrinx from C3-C4 to C6-C7, which was present on the previous cervical spine MRI in 2015.  *Id*. at 2.  There was no evidence of significant stenosis in the cervical spine level, although Nurse Watkins noted some mild disc protrusions.  *Id*.  On July 26, 2018, Ms. Reed presented to Nurse Watkins to review the results of her cervical MRI.  Pet. Ex. 21 at 1.  Nurse Watkins prescribed physical therapy and encouraged Ms. Reed to attend as her schedule allowed.  *Id*.

On August 30, 2018, Ms. Reed presented to Nurse Watkins in follow up.  Pet. Ex. 30 at 1.  Nurse Watkins noted that Ms. Reed continued to take her medication as prescribed and was reporting a benefit with the medications.  *Id*.  However, Ms. Reed felt that her shoulder pain was worsening and she reported intermittent swelling and pain in her neck.  *Id*.  She was assessed with bursitis of the right shoulder and cervical radiculopathy.  She was instructed to continue on her current treatment plan and to return in follow-up in four weeks.  Pet. Ex. 30 at 3-4.  Nurse Watkins also recommended that Ms. Reed try a repeat craniosacral massage in conjunction with physical therapy to "see if we can make some progress with her symptoms and also look at medication reduction if possible."  *Id*. at 4.

---

[7] The medical records note that Nurse Watkins saw Ms. Reed under the supervision of Dr. Wang.

### III.    Impact on Personal Life

Ms. Reed is a single mother, and from the time of vaccination until recently, she was working as a retail manager at Claire's, a jewelry and accessory retailer. Pet. Ex. 3 at 80. In her initial affidavit, which is dated one year and four months after vaccination, Ms. Reed explained that she had multiple rounds of treatment and physical therapy to treat her shoulder pain. Pet. Ex. 8 at 2, ¶6. She takes Tramadol twice a day for the pain and even with the medication, her right arm is still in "incredible amounts of pain." Ms. Reed stated that she "experience[s] constant swelling, limited range of motion, and weakness." *Id.* Her range of motion has improved, but not enough to engage in routine daily activities, especially since she is right-hand dominant. Ms. Reed explained that she could no longer reach above her head, behind her back, put on her bra, tie up her hair, or reach behind her car seat to handle her young son without experiencing pain. *Id.* at 2, ¶7. Ms. Reed stated that she is unable lift her two four-year-old grandsons or lift boxes at work because of shoulder weakness. *Id.* She stated that she cannot sleep on her right side and any movements, such as pushing outward, lifting in any direction, or picking up anything past waist level caused significant pain. Ms. Reed stated that she continued to see a pain management doctor. She fears that she will have this pain for the rest of her life.

Ms. Reed also filed an affidavit from Jolynn Lachance, her Store Manager at Claire's Accessories store. Pet. Ex. 9. At the time of Ms. Reed's vaccination, Ms. LaChance worked with Ms. Reed in the store located in Merrimack, New Hampshire. Ms. LaChance stated that on March 29, 2016, the day after Ms. Reed's vaccination, she observed that Ms. Reed was in a lot of pain. Ms. LaChance specifically recalled Ms. Reed was unable to lift or move inventory because of the amount of pain she was in. Ms. LaChance also confirmed that Ms. Reed left work early the day after the vaccination because of severe shoulder pain. *Id.* Ms. LaChance also stated that she continues to witness Ms. Reed in pain to this day. She stated that Ms. Reed continues to have difficulty engaging in routine tasks, including any movements that require her to lift merchandise, reach high up, or push and pull. *Id.*

Ms. Reed filed an affidavit from her adult daughter, Kiara Reed. Pet. Ex. 11. Kiara explained that on the day her mother received the Tdap vaccine, she babysat her younger brother so that her mother could go to her doctor's appointment. Prior to leaving, Ms. Reed was able to pick up her three-year-old grandson (Kiera's son) and kiss him. After she returned from her doctor's appointment, Ms. Reed stated that her right arm and shoulder were in extreme pain. Although Kiera was worried, her mother assured her that the pain would likely go away on its own. *Id.* The next day, the pain had worsened. Ms. Reed brought her son to Kiera's house so she could babysit while Ms. Reed went to work. Kiera stated that she again observed her mother in pain. Ms. Reed did not pick up her grandson but rather bent over to kiss him goodbye when she left. Kiera recalled that her mother returned from work early that day due to the pain in her right shoulder. Kiera explained that her mother is very independent and would not let her shoulder pain prevent her from working or taking care of her brother (Ms. Reed's son). *Id.* at 1-2.

In her most recent affidavit, dated June 22, 2018, Ms. Reed stated that she continues to feel pain in her shoulder. She stated that it has been more than two years since her Tdap vaccination and she is still under the care of her physician for treatment

of her shoulder pain.  Pet. Ex. 17 at 1.  Ms. Reed stated that because of her pain and the stress of not being able to perform her job duties properly, she resigned from her job after 14 years as a manager of a Claire's accessory story.  She now works as an assistant manager at Walmart.  Ms. Reed stated that although her new job involves mostly management duties, she is still required to do some physical work.  Ms. Reed stated that her son is currently 9 ½ years old her two grandsons are 5 ½.  She expressed her frustration at how her shoulder injury has prevented her from interacting with them in the way that she did prior to the vaccination.  *Id*.  Ms. Reed also filed supplemental affidavits from her daughter, Kiera, and her co-worker Ms. LaChance. Each of them details their continued observation of Ms. Reed and her continued difficulty with managing her shoulder pain.  Pet. Exs. 18-19.

Ms. Reed explained that she is no longer able to participate in activities with both her son and her grandson, who are close in age.  Her son has ADHD autism spectrum disorder, and Ms. Reed described her frustration with her inability to help her son getting dressed, or when they go to amusement parks because of the potential impact to her shoulder.  Tr. 21.

Petitioner also described the impact her injury has had on her working life.  Tr. 19.  She described how quickly she used to work at unpacking merchandise, up to 10 boxes in three hours, but now, because of her lack of strength, she is only able to complete two to three boxes during an entire day of work.  *Id*.

Significantly, Ms. Reed explained that she takes a strong pain opioid medication, Tramadol, because it is the only medication that provides her with some pain relief.  Tr. 54-55.  Ms. Reed explained that Tramadol does not take away her pain entirely, but does "take the edge off the pain" to allow her to get through her working day.  Tr. 55, 62. Currently, it is expected that Ms. Reed will continue to take Tramadol as long as it continues to provide pain relief, but there are concerns about the long-term use of Tramadol, such as the potential for the medication to cause liver and kidney damage. Tr. 55.  Ms. Reed testified, "I am in a position where I am stuck because we can't go any higher [with the amount of Tramadol prescribed] but I can't be off it either…"  Tr. 55.

## IV.    Party Contentions

### A. Petitioner's Position

In addition to compensation for her past unreimbursable medical expenses, petitioner seeks an award of compensation for her past pain and suffering of $250,000, the most allowed for pain and suffering cases in the Vaccine Program under the statutory cap.[8]  Petitioner's Brief Regarding Damages ("Pet. Brief") at 1.

---

[8] Petitioner proposes that SIRVA claims should be categorized based on severity and duration as "rough guidelines" for awarding compensation. (ECF No. 50, p. 25.)  Specifically, petitioner asserts that appropriate awards for pain and suffering would be as follows:

Injuries lasting six months:              $100,000 - $125,000
Injuries from six months to one year:     $125,000 - $160,000
Injuries lasting one year to two:         $160,000 - $190,000

Petitioner argues that her case is different from other SIRVA cases because it is one involving failed surgery, thus making her injury permanent.  She states that she suffered excruciating pain and significant limitations in her range of motion from the time of her vaccination on March 28, 2016, until the time of her shoulder surgery on September 27, 2016.  P's brief at 10.  The surgery did not relieve her pain and petitioner argues that it has made her condition worse.  *Id*.  Consequently, petitioner also seeks an award for future pain and suffering of $20,000.00 per year for the remainder of her life[9], an amount to be reduced to net present value.  *Id*. at 2. Ms. Reed states that she is making no claim for lost wages.

### B. Respondent's Position

Respondent's brief is comprised mainly of a legal analysis of pain and suffering awards in the Vaccine Program.  Respondent's Brief on Damages ("Resp. Brief") at 5. By way of background, respondent explains that since the inception of the Program, the Office of Special Masters has interpreted the Vaccine Act's provision for actual and projected pain and suffering to reserve the statutory maximum "for those who are both the most severely injured and who actually have suffered or will suffer the most pain, suffering or emotional distress."  *Id*. at 4 *citing Stotts v. Sec'y of Health & Human Servs*., No. 89-108V, 1990 WL 293856, at *16 (Cl.Ct. Spec. Mstr. Oct. 11, 1990), *rev'd on other grounds*, 23 Cl.Ct. 352 (1991).  As discussed *supra*, this approach was called into question in *Graves v. Sec'y of Health & Human Servs*., 109 Fed. Cl. 579, 590 (2013) (finding that the "special master policy is not rooted in the statute or precedent").  The Court in *Graves* set forth an approach whereby a special master would first determine the amount of pain and suffering damages, without regard to the $250,000.00 cap, and then if necessary, apply the statutory cap.  *Id*.  Respondent agrees with *Graves* to the extent it calls for an individualized assessment of damages based on the specific facts of a petitioner's case.  However, respondent argues that to the extent *Graves* is interpreted to endorse a methodology where the vast majority of claimants would recover the statutory maximum for pain and suffering, this approach would be inconsistent with the legislative history of the Vaccine Act and the previous approach utilized by the Office of Special Masters for the past two decades.  Resp. Brief at 5.

As such, respondent proposes a pain and suffering award of no more than $120,000.00.  Resp. Brief at 1.  Respondent notes that petitioner's course of treatment for her injury included arthroscopic surgery, several prescription pain medications, two cortisone injections for short-term pain relief, and several courses of PT.  Respondent also notes that Ms. Reed's symptoms are stable with Tramadol and she has continuously worked in retail store management since her vaccine injury.  Recognizing

---

| Permanent residua (non-debilitating): | $175,000 - $250,000 |
| Permanent residua (debilitating): | over $250,000 (reduced by cap to $250,000) |

(ECF No. 50, p. 25-26.) The undersigned notes that, as described below, these proposed awards are significantly higher than what has *typically* been awarded in SIRVA cases.  *See Kim, infra*.

[9] Based on life expectancy, petitioner argues she will suffer her current condition for 39.2 years. (ECF No. 50, p. 26.)

that Ms. Reed required arthroscopic surgery akin to the petitioner in *Collado*, and under the totality of the circumstances, respondent argues that an award of no more than $120,000.00 for Ms. Reed's pain and suffering is just and fair compensation.  Resp. Brief at 12.  Respondent has proffered $4,931.06 for petitioner's past unreimbursed expenses, which petitioner has accepted.  See Joint Status Report filed Nov. 2, 2018 (ECF No. 63).

## V.    Discussion and Analysis

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4).  In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering.  *See I.D.*, 2013 WL 2448125 at *9-11(citing *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g., Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned also may rely on her own experience adjudicating similar claims.  *See Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, it must be stressed that pain and suffering is not determined based on a continuum.  *See Graves*, 109 Fed. Cl. 579.

In *Graves*, the Court rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  The Court noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  *Graves*, 109 Fed. Cl. At 590.  Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id*. at 595.

In that regard, the undersigned notes that over the past four years the Special Processing Unit ("SPU") has amassed a significant history regarding damages in SIRVA cases. In *Kim v. Sec'y of Health & Human Servs.*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018. No. 17-418V, 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018). The undersigned noted that the median award for cases resolved via government proffer is $100,000.00 and the median award for cases resolved via stipulation by the parties is $71,355.26.[10] *Id*. In *Kim*, the undersigned rejected petitioner's citation to a few isolated proffers and noted that "to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlements and proffers conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case."[11] *Id*. at *9.

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering. To date, these decisions are[12]: *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.14 in past unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018

---

[10] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases. The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00. *Kim v. Sec'y of Health & Human Servs., No. 17-418V,* 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018). Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses. *Id*. The undersigned noted that "[t]hese figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement." *Id*.

[11] Petitioner cited the following informal resolutions: *Deak v. Sec'y of Health & Human Servs.*, No. 14-668V ($160,000.00); *Jenny v. Sec'y of Health & Human Servs.,* No. 14-338V ($140,000.00); *Brand v. Sec'y of Health & Human Servs*, No. 12-549 ($178,225.98); and *Strobel v. Sec'y of Health & Human Servs*, No. 15-1375V ($184,750.00). Additionally, petitioner sought to distinguish the informal resolutions in *Curtis v. Sec'y of Health & Human Servs.*, No. 16-85V ($91,217.75) and *Ponsness*, No. 15-826V ($95,000.00).

[12] This list is limited to those decisions which have been made public at the time of issue of this decision.

WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 for medical expenses); *Dobbins*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 for medical expenses); *Cooper v. Sec'y of Health & Human Servs.,* No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses).

In their respective briefs, the parties compared the instant case to *Desrosiers, Dhanoa, Marino, Knauss and Collado*.  Additionally, petitioner cited two decisions issued by other special masters in prior SIRVA cases.[13]  In *Anthony v. Sec'y of Health & Human Servs.*, petitioner was awarded $248,540.00 for pain and suffering.  No. 14-680V, 2016 WL 1169147 (Fed. Cl. Spec. Mstr. Mar. 2, 2016).[14]  In *Courbois v. Sec'y of Health & Human Servs.*, petitioner was awarded $142,794.40 for pain and suffering. No. 13-939V, 2016 WL 2765092 (Fed Cl. Spec. Mstr. Apr. 20, 2016).[15]

## A. Determining Petitioner's Award of Pain and Suffering in This Case

The undersigned is mindful of all the above; however, in determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience in evaluating SIRVA claims, the undersigned finds that an award of $160,000.00 for petitioner's actual pain and suffering is appropriate in this case.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

---

[13] Petitioner also cited several intussusception cases; however, in the undersigned's view, such cases are not sufficiently analogous to be instructive.

[14] The decision issued in the *Anthony* case did not address the factors that contributed to the special master's award.  The special master had previously ruled from the bench following a damages hearing.

[15] Like *Anthony*, the special master in *Courbois* had made a prior oral ruling and the factors contributing to the special master's award were not disclosed.

### a. Severity of the Injury

With respect to the severity of petitioner's injury, Ms. Reed argues that her shoulder injury was acutely severe; severe enough to require surgery. Even after her surgery, Ms. Reed stated she continued to suffer severe pain in her shoulder as well as a limited range of motion. Ms. Reed testified that not only is her shoulder injury not improving, it is getting worse despite the surgery, cortisone injections and physical therapy. Pet. Brief at 14. Ms. Reed states that her pain management specialist recommends that she start attending physical therapy again. *Id.* Ms. Reed also testified that she is starting to experience pain in her neck that radiates into her fingers. *Id.* These symptoms are new and have been treated with trigger point injections. The pain management specialist noted that the pain in her neck is "hard to distinguish from her shoulder or a separate problem." *Id.* at 17.

The undersigned acknowledges and finds that Ms. Reed suffered severe shoulder pain from the time she received the Tdap vaccination at issue in this case on March 28, 2016, until time she underwent shoulder surgery on September 27, 2016 – a period of approximately six months. During this time, she consistently rated her pain level as anywhere from a six to a nine on a pain scale to 10. In the medical records, Ms. Reed describes her shoulder pain as "searing", "intense", "burning" and "throbbing." She guarded her arm during physical examinations and demonstrated a decreased range of motion of the right shoulder. Once Ms. Reed began attending physical therapy in May 2016, her pain level slightly decreased, and she began to have improvement in the range of motion of her shoulder. *See* Pet. Ex. 7 at 3. After she received a cortisone injection on July 6, 2016, Ms. Reed's pain rating dropped to a two out of 10. Pet. Ex. 5 at 111. However, Ms. Reed stated that the pain relief was short-lived, and her pain slowly returned.

By August 2016, Ms. Reed complained that her shoulder pain was increasing, in part due to the physical demands of her job. Pet. Ex. 5 at 120; Pet. Ex. 3 at 146. Although she complained of continued pain, her orthopedist, Dr. Tom saw nothing on Ms. Reed's MRI that necessitated surgery. *See* Pet. Ex. 3 at 148. In fact, Dr. Tom expected "the edema in the muscle of the infraspinatus to continue to improve as it has been." Pet. Ex. 3 at 139; Pet. Ex. 5 at 111. During this visit, Ms. Reed rated her pain at a 2 out of 10. Dr. Tom noted that Ms. Reed had made significant improvement with her range of motion of the right shoulder, although she continued to have limited AROM with her internal and external rotation due to pain. She had also made improvements with her right shoulder strength and function. Continued physical therapy was recommended. *Id.*

Seeking a second opinion, Ms. Reed presented to Dr. Marino for an evaluation of her shoulder. Dr. Marino agreed with Dr. Tom's assessment as well as the course of treatment he recommended and provided. At the time of Ms. Reed's initial evaluation, Dr. Marino stated that surgical intervention was a possibility later in time, but that he would not recommend surgery at that time. Pet. Ex. 3 at 146. However, by September 2016, Ms. Reed continued to complain of shoulder pain and at this time, Dr. Marino

revisited the idea of shoulder surgery.  Pet. Ex. 4 at 2.  He explained that shoulder surgery may not completely relieve her symptoms but explained that it may provide some short and/or long-term relief.  Ms. Reed elected to proceed with surgery.

Following her surgery, Ms. Reed appeared to experience some pain relief. During her second post-operative appointment with Dr. Marino, she reported feeling "okay" although she had a setback and felt that something "popped" in her shoulder. Pet. Ex. 4 at 27.  On physical examination, Ms. Reed had good range of motion and Dr. Marino commented that Ms. Reed's condition "was not out of the ordinary."  *Id*. at 28. By June 7, 2017, Ms. Reed was able to put her arm over her head, but she did have pain on "resistive function."  In his assessment, Dr. Marino stated that he did "not really have a quick fix" to Ms. Reed's ongoing complaints of shoulder pain other than attempting another cortisone shot; but Ms. Reed declined.  *Id*. at 2.  Dr. Marino stated, "hopefully long-term these types of problems are self-limiting and will see hopefully continued improvement long term. I do not think there is any need for further intervention or surgical intervention at this time. She understands this and will come back here if needed."[16]  *Id*. at 2.

Ms. Reed continued to complain of shoulder pain at a reduced level of three to six on a scale of 10.  She began seeing a pain management specialist in January 2017, whom she continues to see to the present day.  Ms. Reed continues to take pain medications which she argues she will likely need for some time to maintain her current pain levels.  Tr. 91-93. The undersigned finds that petitioner continued to experience residual pain and reduced range of motion through the date of the hearing in this case, approximately two years and four months following petitioner's injurious vaccination.

The undersigned also acknowledges that additional non-medical mitigating factors are present in this case.  For instance, Ms. Reed has credibly described her physical difficulty in caring her son and grandchildren and performing other activities of daily living.  Ms. Reed's affidavit and testimony, and the affidavits and testimony of her witnesses, as a whole, reiterate that her injury caused physical and emotional distress and led to significant disruptions of her ability to work, care for her family, and enjoy recreational activities.

Ms. Reed argues, however, that she was "forced" to change jobs as a result of her shoulder injury.  In her brief, she requests that the undersigned consider that she had worked for Claire's for 14 years and would not have left that job to become an assistant manager for Walmart had it not been for her shoulder dysfunction.  Pet. Brief at 11.  The undersigned notes, and petitioner's does not dispute, that the Walmart position was advertised as a position involving less physical labor and more pay.  Ms. Reed's former co-worker at Claire's, Jolynn Lachance, testified that Ms. Reed had encouraged her to apply for a position at Walmart, which Ms. Lachance did.  This fact suggests that Ms. Reed may have taken the Walmart position, whether or not she suffered a shoulder injury.

---

[16] This appears to be Ms. Reed's last appointment with her orthopedic surgeon.

The undersigned also acknowledges that additional non-medical mitigating factors are present in this case.  Ms. Reed's injury has impacted her personal life.  In particular, petitioner has credibly explained how her injury has demonstrably impacted her lifestyle taking care of herself, as well as her young child, who has an ADHD autism spectrum disorder, and her two young grandchildren.  Tr. 16-20.  During her testimony, Ms. Reed described in detail her physical difficulty in caring for her son.  She also discussed similar difficulties with caring for her grandchildren and performing other activities of daily living.  Ms. Reed's affidavit and testimony, and the affidavits and testimony of her witnesses, as a whole, reiterate that her injury caused physical and emotional distress and led to significant disruptions of her ability to work, care for her family, and enjoy recreational activities.

### b.  Duration of the Suffering

#### i.  Past Pain and Suffering

Ms. Reed argues that for two and a half years after receiving the Tdap vaccine and one year after having surgery, she continued to have very significant pain.  She requires monthly visits to a pain management specialist.  Because of this, Ms. Reed has categorized her injury as a "failed surgery" case and argues for the maximum $250,000 award for her past pain and suffering for the significant daily pain she has endured for two and a half years.

The undersigned acknowledges and finds that Ms. Reed suffered severe shoulder pain from the time she received the Tdap vaccination at issue in this case on March 28, 2016, until time she underwent shoulder surgery on September 27, 2016 – a period of approximately six months.  As described above, there is also significant evidence of further residua following this six-month period, involving mostly pain, but also some restricted range of motion.  Petitioner remained in physical therapy from a time shortly after her vaccination until her post-operative physical therapy in September 2016.  After she completed physical therapy, she continued to be treated by a pain management specialist as her range of motion had improved greatly with physical therapy, but her pain had not subsided.

At the time of the hearing, petitioner continued to be treated by her pain management specialist.  Ms. Reed claims that there is no indication that these visits will stop because of the ongoing nature of her pain.  Upon the undersigned's review of the record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, the undersigned finds that an award of $160,000.00 for petitioner's actual pain and suffering to be appropriate in this case.

#### ii.  Future Pain and Suffering

In her brief, Ms. Reed argues that her injury is permanent.  Pet. Brief at 11.  She states, "there can be no legitimate dispute as to this critical fact."  Because of this, Ms. Reed argues that she is entitled to a "significant" award for future pain and suffering.  At the time of the hearing, Ms. Reed was 46 years old; she argued that she "will endure

pain each and every day for the remainder of her life." Ms. Reed notes that she must take a strong opioid medication to treat her pain every day. She therefore requests $20,000.00 per year for the rest of her life, nothing that the undersigned must cap her total award for pain and suffering at $250,000.00. Pet. Brief at 14.

There are only two reasoned SIRVA damages decisions that have awarded compensation for future pain and suffering: *Dhanoa v. Sec'y of Health and Human Serv.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) and *Curri v. Sec'y of Health & Human Servs.*, No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). In *Dhanoa*, the special master awarded $10,000.00 for pain and suffering for the year immediately following the decision, but gave no award for subsequent years. 2018 WL 1221922 at *7. In *Curri,* taking into account petitioner's significant arm pain, her permanently reduced range of motion, and the unique challenges petitioner faced in her day-to-day life, the special master found that $550.00 per year to be an appropriate award for petitioner's future pain and suffering. 2018 WL 6273562 at *6.

In this case, the undersigned finds that the evidence is insufficient to support a claim of permanent injury. In *Curri*, the petitioner filed a record from her orthopedist stating that petitioner's shoulder "had reached its 'maximum medical improvement,' leaving her with a permanent 'scheduled loss of use' of 22.5 percent of her left arm." *Id*. at *2. We have no evidence that Ms. Reed's shoulder injury is permanent. While petitioner adamantly argues that her injury is a "classic case of failed surgery" and thus, her shoulder injury is permanent, Ms. Reed has not submitted a statement or medical record from a medical professional to this effect. Petitioner sidesteps this fact by stating that "[n]o physician has ever told her that her condition will improve." Pet. Brief at 18. This statement is not accurate. Dr. Tom stated that he expected Ms. Reed's condition to improve. And while petitioner testified that Dr. Marino told her that she would have to live indefinitely with her shoulder symptoms, there is no documentary evidence of this prognosis. Tr. 58-60.

Petitioner bears the burden of proof with respect to each element of compensation requested and the medical records are the most reliable evidence of petitioner's condition. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl.Spec. Mstr. Mar. 18, 1996)*; Shapiro v. Sec'y of Health & Human Servs.,* 101 Fed. Cl. 532, 537-38 (2011). Moreover, during the damages hearing, petitioner requested time to obtain a statement from Dr. Wang regarding her future treatment. Petitioner was granted additional time, although no statement from Dr. Wang was ever filed. Petitioner filed a Statement of Completion on September 27, 2018 stating that "the record in this matter is now complete." (ECF No. 61).

Based on the statements of Ms. Reed's treating medical providers, and without adequate medical evidence demonstrating the likelihood that petitioner's shoulder injury, more likely than not, will extend well into the future and the lack of evidence indicating that her shoulder injury is permanent, the undersigned cannot make an award for petitioner's future pain and suffering. This finding is based on several factors. First, in reviewing the records of Ms. Reed's most recent visit with Dr. Marino on June 7, 2017 regarding Ms. Reed's shoulder injury Dr. Marino stated that "hopefully long-term these

types of problems are self-limiting and will see hopefully continued improvement long term. I do not think there is any need for further intervention or surgical intervention at this time. She understands this and will come back here if needed." Pet. Ex. 13 at 2. On August 30, 2018, Ms. Reed's most recent visit with her pain specialist, Nurse Watkins, it is noted that Ms. Reed's upper extremity range of motion was "grossly normal" although she did have some decreased range of motion of her cervical spine. Pet. Ex. 30 at 3.  Nurse Watkins recommended that Ms. Reed continue with a repeat craniosacral massage along with additional physical therapy "to see if we can make some progress with her symptoms and also look at medication reduction if possible." *Id*. at 4.  These types of statements from Ms. Reed's treating physicians and specialists indicate to the undersigned that Ms. Reed's condition is expected to improve.  Nurse Watkins indicated that she would be working with Ms. Reed to decrease her pain and the amount of medication Ms. Reed would be taking in the future.  There is no indication in these records that Ms. Reed's shoulder injury is permanent.  In the most recent medical record filed, Ms. Reed's range of motion of the shoulder was recorded to be "grossly normal", another distinguishing factor from the petitioner in *Curri* who had a permanent reduction of the range of motion of her shoulder.  2018 WL 6273562 at *2. Therefore, without any additional information regarding the future prognosis of petitioner's shoulder injury and the lack of medical evidence supporting a finding of a permanent shoulder injury, the undersigned finds that an award for petitioner's future pain and suffering is not appropriate in this case.

### B.  Award for Past Unreimbursed Expenses

Ms. Reed has provided documentation of her past unreimbursable expenses. Pet. Ex. 22-23.  On November 2, 2018, the parties filed a joint status report stating confirming respondent's proffer of $4,931.06 for petitioner's past unreimbursed expenses in this case.  (ECF No. 63).

### C.  Amount of the Award

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  For all the reasons discussed above, the undersigned finds that $160,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.  In addition, the undersigned finds (with the agreement of the parties) that petitioner is entitled to compensation for $4,931.06 for her past unreimbursed expenses.

### VI.   Conclusion

In light of all of the above, the undersigned awards the following compensation:

**A lump sum payment of <u>$164,931.06</u>, (representing $160,000.00 for petitioner's actual pain and suffering and $4,931.06 for unreimbursable medical expenses) in the form of a check payable to petitioner, <u>Jennifer Reed</u>.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).  *Id*.

The clerk of the court is directed to enter judgment in accordance with this decision.[17]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.